THE STATE OF NEVADA, APPELLANT, *v.* HAROLD SORENSON, AND BEAUFORD JOHNSON, RESPONDENTS.

No. 3957

September 20, 1957                                        315 P.2d 508

*Harvey Dickerson,* Attorney General, of Carson City, and *Wayne O. Jeppson,* District Attorney, Lyon County, for Appellant.

*John Squire Drendel,* and *William O. Bradley,* both of Reno, for Respondents.

**O P I N I O N**

By the Court, EATHER, J.:

This is an appeal by the state from an order granting the respondents a new trial after they had been found guilty by a jury of grand larceny. Such new trial was granted on account of asserted misconduct in permitting

to be exhibited to the jury a pair of chalk-stained shoes which had not been admitted in evidence. The appeal is based on the contention that the granting of a new trial was an abuse of the trial court's discretion. We have concluded that there was no such clear abuse of discretion as to justify a reversal.

Defendants were charged with having stolen from the service station of C. T. Johnson, near Fernley, Nevada, on Highway 40, a cash register containing $130 in money and about $210 in checks and credit cards, all of a total value of about $730. Entirely free of the assigned misconduct the testimony without contradiction (neither defendant took the stand or offered any evidence) shows the following facts:

Charles Johnson assisted his father C. T. Johnson in the operation of the service station and motel and was on shift about 6:00 a. m. September 27, 1955, when a Cadillac car drove up; defendant Johnson alighted, went into the service station and asked Charles if he had a tire that would fit the Cadillac. While Charles was searching for the tire in the adjacent garage, he heard the car door slam and saw the car depart toward Lovelock, so fast that it threw gravel back to where the witness stood. He noticed that the cash register was gone from its place (no one else had been in the station for about an hour), and telephoned Larry Fister of the State Highway Patrol, who arrived shortly, and was told of the circumstances, and advised calling Paul Hollenbeck, deputy sheriff, whose patrol district was the Fernley area. Both Fister and Hollenbeck had obtained a description of the car from Charles Johnson. Hollenbeck ordered a "stop." Fister proceeded in his car on Highway 40 toward Lovelock, and after driving some 25 miles to a point near a road coming in from the chalk mines or chalk beds, he saw the described Cadillac coming from the chalk beds toward the highway. He tried to stop but was going so fast that he overshot the chalk beds road. The Cadillac drove on to the highway and headed back toward Fernley and Fister turned and took off after

it. He observed two men in the car. Although he accelerated to 100 miles an hour he was unable to overtake the Cadillac. Fister then, by means of his short-wave radio-telephone contacted Hollenbeck advising him of the situation. There were an empty truck and trailer that had just pulled up into the service station and Hollenbeck had them pull out across the highway as a road block. The two defendants pulled up in their green Cadillac, were stopped by the road block and were arrested.

Charles Johnson then accompanied Fister and Hollenbeck to the chalk mines, followed the fresh auto tracks from the highway through various pits until they arrived at a place where a fresh slide of chalk was evident. This proved, on investigation, to be the place where the cash register, identified as the one in question, was buried. The front had been "all smashed in and broke up and forced open" and the contents, excepting a few coins, removed. Charles Johnson and his father later made a second trip to the chalk beds.and, after sifting the chalk with a pitchfork, discovered the checks and credit cards that had been in the cash register and which had been taken in during the preceding night.

Examination of the floor mats on the Cadillac clearly disclosed evidence of chalk, as did a hammer that lay behind the front seat of the car.

We come then to the asserted misconduct of the district attorney on the basis of which the learned trial judge granted the motion of the defendants for a new trial.

The trial judge described the situation as follows: "In this matter the factual situation was that from the moment the jury was sworn and the state opened its case, continuing to the moment when the state closed its case, there was on display in this court room a pair of tan shoes covered with some white powder * * * along with the other exhibits that had been marked for identification in the case. That pair of shoes reposed on the table directly in front of the judge's bench for nearly all of the time, in the full view of the entire jury panel.

They were moved about from time to time by the district attorney in the presentation of his case. Except for the testimony of the witnesses as to footprints at the chalk beds, there was not one scintilla to connect those shoes with either of the defendants or with the offense with which they were charged. The shoes were never marked for identification; they were never offered in evidence."

The learned trial judge then, after determining that it was impossible to state what influence this might have had on the jury, emphasized, by constant repetition, what was apparently considered to be the crux of the motion—whether this display of the shoes with the chalk markings, when the shoes had not been introduced in evidence, prevented the defendants from receiving a fair and impartial trial. He concluded that the display of the shoes without attempt to connect them with the defendants was prejudicial to their rights, and accordingly directed that the verdict be set aside and a new trial ordered.

The court instructed the jury: "In the course of a trial, sometimes various articles are displayed in the presence of the jury which are subsequently not received in evidence. You are to consider only those exhibits which are received in evidence, in this case plaintiff's exhibit 'B'. As to any other things which are displayed in the course of the trial, you are instructed to disregard them and not to consider them in your deliberations."

Sec. 11266 N.C.L., now NRS 169.110, provides: "No judgment shall be set aside, or a new trial granted, in any case on the ground of misdirection of the jury or the improper admission or rejection of evidence or for error as to any matter of pleading or procedure, unless in the opinion of the court to which application is made, after an examination of the entire case, it shall appear that the error complained of has resulted in a miscarriage of justice, or has actually prejudiced the defendant, in respect to a substantial right."

The state contends that the court's order granting the

defendants' motion for a new trial was an abuse of discretion requiring reversal. It points to sec. 11266 N.C.L., now NRS 169.110, quoted above. It contends that the record conclusively shows that the verdict of guilty was not a miscarriage of justice and that the exhibiting of the shoes could not have actually prejudiced either of the defendants in respect to a substantial right for the reason that even if the implication to be drawn therefrom was that the shoes had been worn by one of the defendants while in the chalk pits, such fact had been conclusively proved by other independent evidence. It may well be that this court would have exercised its discretion in a different manner. That discretion, however, was not and is not vested in this court. Under our system it was properly vested in the trial court. That court was in a position to observe the effect that the exhibiting of the shoes had upon the jury and to determine whether this extrajudicial proof prevented the defendants from having a fair and impartial trial.

In People v. Canfield, 173 Cal. 309, 159 P. 1046, 1047, the defendant after conviction upon a charge of forgery, was granted a new trial, from which order the people appealed. The Supreme Court of California unanimously held: "It was for the judge of the trial court to say what had been the effect of the evidence upon the jury, and whether or not the defendant, in view of all the facts, had been given a fair trial. If the motion for a new trial had been denied, the prosecution might then well have invoked in favor of the conviction the section of the Constitution which provides that no new trial shall be granted in any criminal case on the ground that improper evidence has been admitted, 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' Section 4½, art. 6, Constitution of California. But this section of the Constitution was not designed to take from the trial court and transfer to the appellate court the high discretion vested in that tribunal. The judge, who

presided at the trial of the cause, who heard the testimony, who observed the jurors and had an opportunity also of testing the truth of the defendant's statements by noticing his demeanor, was in a peculiarly favorable position for determining justly the question whether or not the defendant had been accorded a fair trial. We cannot follow the mental processes of the judge. He may have been profoundly impressed with the influence upon the jury, to Canfield's injury, of the introduction of the evidence tending to prove another offense. Or he may have doubted the identification by the witnesses for the prosecution of Canfield. * * * We can hardly manufacture in fancy an hypothetical situation in which a reviewing court would be justified in questioning the discretion of the trial court who should grant a new trial in a case involving a criminal charge. Surely there is no basis in the case before us for the substitution of the discretion of this court for that of the superior court. We must assume that the learned judge of the trial court acted with a full appreciation of his duties and obligations, with the cited section of the Constitution in mind, and that the conclusion which he reached was not governed by any idle nor any mere technical reasons."

In People v. Rosenberg, 135 Cal.App. 766, 26 P.2d 922, an appeal by the state from an order granting a new trial after conviction of a burglary, the foregoing case was cited at length in refusing to interfere with the exercise of such discretion by the superior court. In the Canfield case the court somewhat modifies its views that it can hardly fancy a case in which the reviewing court would be justified in questioning the trial court's discretion in such case, by the statement that at least "in the case before us" the court would not substitute its discretion for that of the superior court. We too would impose a limitation. We are not inclined to bar ourselves from holding in a proper case that judicial discretion had been abused in granting a new trial after conviction.

The present appeal is no occasion for the exercise of discretion of this court. The exercise of discretion in ruling upon the motion for new trial was exclusively vested in the district court and we are unable to find such abuse of discretion as to warrant reversal.

The state further contends that the statutory requirement that a motion for new trial based on misconduct must be supported by affidavit was not complied with and that for such reason it was error to grant the motion. As against this, respondents contend that as the misconduct relied upon was in the presence of the court, requirement for filing of affidavits was not applicable. We need not determine this point, as it is apparent that the trial court granted the motion for the additional reason that his prior order denying a motion for mistrial was error—a ground not requiring support by affidavit.

Affirmed.

BADT, C. J., and MERRILL, J., concur.